[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 17, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14726
Non-Argument Calendar

_____

D.C. Docket No. 04-00008-CR-4-RH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KIMBERLY SHEA TEBRUGGE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 17, 2005)

Before BIRCH, BARKETT and FAY, Circuit Judges.

PER CURIAM:

Kimberly Shea Tebrugge directly appeals her 12-month and 1-day sentence for knowingly concealing and possessing stolen firearms, in violation of 18 U.S.C. § 922(j) and 924(a)(2). Tebrugge argues on appeal that the district court (1) clearly erred in not adjusting her guideline offense level based on minor role, pursuant to U.S.S.G. § 3B1.1(b); (2) violated her Fifth Amendment right not to incriminate herself at sentencing; and (3) violated her Sixth Amendment right to a jury trial in considering the federal guidelines in sentencing her, in light of Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, ___ L.Ed.2d ___ (2005). For the reasons set forth more fully below, we affirm Tebrugge's sentence.

A federal grand jury returned an indictment, charging Tebrugge and her husband, Kevin R. Tebrugge, with the above-referenced offense and listing the firearms that the Tebrugges allegedly possessed and concealed. Kimberly Tebrugge subsequently entered into a plea agreement, whereby she agreed to plead guilty to this offense in exchange for the government agreeing to dismiss the remaining count in her indictment.

As part of this plea agreement, Tebrugge conceded that the government could prove the following facts beyond a reasonable doubt. In November 2002,

Jack Neely, Sr., provided to the Tebrugges his furnished home in Tallahassee, Florida, which contained a locked gun safe. After Kimberly Tebrugge found the combination to this safe, she and Kevin Tebrugge opened it. In June 2003, the Tebrugges moved out of this home, at which time they stole the 22 firearms—the same firearms listed in their indictment—from the gun safe in the home. The Tebrugges then concealed these firearms in a storage facility in Tallahassee. Approximately five days later, the Tebrugges removed the firearms from the storage facility; transported them to Wilkes County, North Carolina; and left them with Alan Brown, one of Kevin Tebrugge's former colleagues. All of these stolen firearms were manufactured outside the state of Florida and, thus, had been shipped or transported in interstate commerce before they were stolen.[1]

During Tebrugge's plea colloquy, she verified that she had read and signed the plea agreement, and that the facts contained within it were true. She clarified, however, that (1) after she opened the safe, her husband was the one who had removed the firearms; and (2) she had committed the acts on her husband's instruction because she had been scared of what, otherwise, would have happened. After Tebrugge pled guilty, the court found that (1) the facts were sufficient to

---

[1] In addition to these facts, the parties agreed that they were reserving the right to appeal any sentence that the court imposed.

3

support her plea, (2) Tebrugge was competent to plead guilty, and (3) her plea was knowing and voluntary. The court, therefore, accepted Tebrugge's plea and adjudicated her guilty.

Tebrugge's presentence investigation report ("PSI") calculated her base offense level as 12, pursuant to U.S.S.G. § 2K2.1(a)(7). The probation officer recommended a 4-level increase, pursuant to U.S.S.G. § 2K2.1(b)(1)(B), because the offense involved 22 firearms, and a 3-level downward adjustment, pursuant to U.S.S.G. § 3E1.1, for acceptance of responsibility. The officer, however, did not recommend an adjustment based on Tebrugge's role in the offense. With an adjusted offense level of 13 and a criminal history category of I, Tebrugge had a resulting guideline range of 12 to 18 months' imprisonment. The PSI also noted that the victim had reported a total loss of $7,000, based on two missing shotguns and damage to the recovered firearms.

Tebrugge objected to the PSI's (1) statement that she removed the firearms from the safe and put them in a storage facility; (2) findings as to restitution; (3) failure to recommend a downward departure based on Tebrugge's diminished capacity and the victim's wrongful behavior; and (4) failure to recommend an adjustment for minor role, pursuant to U.S.S.G. § 3B1.2(b). In response to Tebrugge's § 3B1.2(b) objection, the probation officer contended that Tebrugge's

4

involvement in the offense included (1) obtaining the combination to the safe in which the firearms were located; (2) opening the safe so that the firearms could be removed; and, (3) helping, at least passively, to transport these firearms first to a storage facility and later to another location in North Carolina. The officer also argued that Tebrugge was not charged in a conspiracy and only was being held accountable for her own acts.

At the first sentencing hearing, Tebrugge adopted her husband's pretrial motion to declare the federal guidelines unconstitutional, in light of Blakely, and renewed her motion for a § 3B1.2(b) adjustment.[2] When sentencing re-commenced, Tebrugge testified that, during the time period of the offense, her husband, who suffered from bipolar disorder, had become irate and violent and had physically abused her, resulting in her having to contact the police. On the day that she opened the firearm safe, she had taken medication, had been instructed to open the safe, and had not see her husband remove the firearms. Tebrugge, however, later learned that her husband had removed these firearms and had placed them in a storage facility that she previously had rented to store valuables. When she and her husband had traveled to North Carolina, she had not

---

[2] Although the record on appeal does not contain a transcript of this first sentencing hearing, neither party contests that, during this hearing, Tebrugge raised a Blakely challenge and renewed her § 3B1.2(b) objection.

seen firearms being unloaded and had not had any conversations with Brown, their colleague who was storing the firearms. After this trip, she had had two conversations with Brown, during which (1) Brown had told her that she and her husband should come back for the firearms, and (2) she had told Brown that her husband had suggested removing the firearms' serial numbers.

On cross-examination, Tebrugge stated that (1) she had paid Neely, the owner of the stolen firearms, $900 a month; and (2) she had not known if this amount was for rent or to purchase the furniture inside the home. After she opened the safe with the firearms, she had gone to bed and, thus, had not known what had happened to the items in the safe. She also stated that she only had assumed that she and her husband were taking the firearms to North Carolina, and that she had slept during most of their trip.

The prosecutor then asked Tebrugge if she had taken furniture from Neely's home, to which Tebrugge answered affirmatively. Tebrugge, nevertheless, objected to this question, arguing that (1) she did not wish to incriminate herself because she had a pending state charge relating to her taking this furniture, and (2) the question was not within the proper scope of cross-examination. The court overruled this objection, concluding that Tebrugge's knowledge about the stolen furniture was directly relevant to her knowledge about, and involvement with, the

6

stolen firearms. Nevertheless, the court gave Tebrugge the option of either asserting her Fifth Amendment privilege and withdrawing her direct examination from the court's consideration, or answering all the prosecutor's questions that were within the scope of cross-examination.

When Tebrugge responded that she wished to proceed with her testimony, she replied that she had thought that she and her husband were going to pay for the furniture once her husband had his medical license reinstated. Tebrugge also conceded that she had believed, and had told other people, that her husband had taken the firearms in response to Neely burning her husband's boat. Moreover, on the court's questioning, she admitted that her husband had told her during their trip to North Carolina that he was taking the firearms to Brown to store for them.[3]

The government, in turn, introduced the following testimony of Brown.[4] When the Tebrugges had come to his home in North Carolina in June 2003, he had agreed to store the firearms overnight. After the Tebrugges had arrived at his home, and while both of the Tebrugges were present, Kevin Tebrugge had told him that they were not worried about fingerprints in the safe because Kimberly

_____

[3] Before resting, the defense also offered the testimony of Dr. William Kepper, Tebrugge's primary care physician. Although Dr. Kepper stated that Tebrugge may have been taking Darvocet and Vicoden during the relevant time period, this medication only would have had the effect of making her sleepy.

[4] On the parties' joint stipulation, this testimony occurred via telephone.

7

Tebrugge had wiped the safe down with soap and water, and that they felt they would not be convicted if (1) they "stuck to their stories" and (2) the firearms were not recovered. During a subsequent telephone call Brown had with Kimberly Tebrugge, Kimberly had told him to "file," burn, or, otherwise, destroy the firearms. Brown also stated that, although he had seen the Tebrugges engage in lots of disagreements, Kimberly Tebrugge was an assertive spouse, instead of being "meek and mild."

The court determined that Kimberly Tebrugge was not a minor participant because she had "fully participated in the theft," the Tebrugges jointly had taken the firearms to North Carolina to conceal them, and they had conspired to avoid conviction.[5] The court clarified that, although it did not believe that Kimberly Tebrugge was more culpable than her husband, no role adjustment was warranted. With an adjusted offense level of 13 and a criminal history category of I, Tebrugge's resulting guideline range was 12 to 18 months' imprisonment. The court, however, explained that it had concluded that Blakely was applicable to the federal guidelines, such that it could consider them, but that these guidelines were merely advisory.

---

[5] Noting the discrepancies between Tebrugge's testimony during her plea hearing and at sentencing, the court speculated that she should not receive an adjustment for acceptance of responsibility, but did not reach a finding on this absent the issue being raised.

After giving Tebrugge the opportunity to allocute, the court sentenced her to 12 months' and 1 day' imprisonment, 3 years' supervised release, a $100 assessment fee, and $7,000 in restitution. With no objections from the parties, the court ordered that Tebrugge's husband's sentence should not commence until after Tebrugge's period of incarceration had ended, to allow the couple to continue caring for their minor children. The court also explained that it was imposing a sentence at the low end of Tebrugge's guideline range because (1) she played a lesser role than her husband in the offense; (2) her criminal history was minimal; and (3) her intent in possessing the firearms was retaliatory, instead of to profit from their sale. Finally, the court explained that it had decided that Tebrugge's motion for a downward departure was not warranted. When the court inquired whether Tebrugge required further explanation, she responded negatively.

As discussed above, Tebrugge first argues that the court erred in failing to adjust her offense level downwards two levels, pursuant to U.S.S.G. § 3B1.2(b), based on her minor role in the offense of conviction. Tebrugge summarily asserts that (1) she had taken no initiative and had not been active in pursuing the offense; (2) although she had not acted under legal duress, she still had acted under the influence of her husband; (3) her husband had been "the mastermind and the primary actor"; and (4) her participation only had been "tangential."

9

Section 3B1.2(b) of the Sentencing Guidelines provides for a two-level adjustment in a defendant's base offense level if she was a minor participant in the offense. U.S.S.G. § 3B1.2(b). A district court's determination of a defendant's role in an offense constitutes a factual finding reviewed for clear error. United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). The defendant bears the burden of proving by a preponderance of the evidence that she is entitled to a minor-role adjustment. Id. at 939.

A minor participant in an offense means a participant "[w]ho is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.5). To determine whether a defendant played a minor role in the offense for which she has been held accountable, the court must "measure the defendant's role against the relevant conduct attributable to her in calculating her base offense level." De Varon, 175 F.3d at 944. Where the relevant conduct attributable to a defendant "is identical to her actual conduct, she cannot prove that she is entitled to a minor-role adjustment simply by pointing to some broader criminal scheme in which she was a minor participant but for which she was not accountable." Id. at 941.[6] Although in many cases this first

_____

[6] Amendment 635 of the Sentencing Guidelines, which revised the commentary to § 3B1.2, states that a defendant "who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this

10

method of analysis will be dispositive, the court also may measure the defendant's culpability in comparison to that of other participants in the relevant conduct. Id. at 944-45.

In the instant case, Tebrugge conceded during sentencing that she had opened the safe containing the stolen firearms and had rented the storage facility in which her husband initially had placed these firearms. She also conceded that her husband had told her during their trip to North Carolina that they were transporting the firearms out of the state. Moreover, Brown testified that Tebrugge's husband had told Brown, with both the Tebrugges being present, that (1) they were not worried about fingerprints in the safe because Kimberly Tebrugge had wiped the safe down with soap and water, and (2) they believed they would not be caught if they "stuck to their stories." Brown also stated that, during a subsequent call with Kimberly Tebrugge, she had instructed him to "file," burn, or, otherwise, destroy the firearms. Tebrugge, therefore, failed to establish by a preponderance of the evidence that she had played only a minor role in the offense of knowingly concealing and possessing stolen firearms. See De Varon, 175 F.3d at 939, 944.

---

guideline." See U.S.S.G. § 3B1.2, comment. (n.3(A)). We have determined that the Sentencing Commission, through Amendment 635, ratified our approach in De Varon. See United States v. Boyd, 291 F.3d 1274, 1277 (11th Cir. 2002).

In addition, although the court—in sentencing Tebrugge at the low end of her guideline range—stated that it had determined that she was less involved in the offense than her husband, we have explained that "a defendant is not automatically entitled to a minor role adjustment merely because she was somewhat less culpable than the other discernable participants." See De Varon, 175 F.3d at 944. The district court, therefore, did not clearly err in denying Tebrugge's request for a § 3B1.2(b) minor-role adjustment.

Tebrugge also argues that the court violated her Fifth Amendment right not to incriminate herself by compelling her to testify during cross-examination at sentencing as to facts relating to a pending state criminal action. She asserts that this Fifth Amendment right superseded the government's right to cross-examine her on "tangential" or "inconsequential" issues. In the alternative, she contends that "[t]he government should not be given a free pass to compel a defendant to incriminate herself simply because the questions are 'proper cross-examination.'"

"We review a district court's ruling on a defendant's invocation of [her] privilege against self-incrimination de novo." United States v. Hernandez, 141 F.3d 1042, 1049 (11th Cir. 1998). The Fifth Amendment's self-incrimination clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This prohibition "not only

permits a person to refuse to answer official questions at a criminal trial in which [she] is a defendant, but also privileges [her] not to answer official questions put to [her] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [her] in future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409 (1984) (quotation and marks omitted). Indeed, a defendant retains this privilege at her sentencing hearing. See Mitchell v. United States, 526 U.S. 314, 321, 199 S.Ct. 1307, 1311, 143 L.Ed.2d 424 (1999); United States v. Rodriguez, 959 F.2d 193, 197 n.3 (11th Cir. 1992).

In a single proceeding, however, a witness "may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." Mitchell, 526 U.S. at 321, 199 S.Ct. at 1311-12. "The privilege is waived for the matters to which the witness testifies, and the scope of the waiver is determined by the scope of relevant cross-examination." Id. at 321, 199 S.Ct. at 1312 (quotation and marks omitted). As justification for this waiver, the Supreme Court has explained that "[a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." Id. at 322, 199 S.Ct. at 1312 (quotations and marks omitted). Thus,

once a defendant voluntarily testifies in her own behalf, she may be cross-examined as to (1) matters "reasonably related" to the subject matter of the direct examination, and (2) matters affecting credibility. United States v. Pilcher, 672 F.2d 875, 877 (11th Cir. 1982); see also United States v. Clemons, 32 F.3d 1504, 1511 (11th Cir. 1994) (holding that "[t]he government's questions [on cross-examination] must be 'reasonable related' to the subjects covered by direct testimony" (quotation omitted)).

Furthermore, the Supreme Court has clarified that the Fifth Amendment's Self-Incrimination Clause guarantees "only that the witness not be compelled to give self-incriminating testimony." McKune v. Lile, 536 U.S. 24, 35-36, 122 S.Ct. 2017, 2026, 153 L.Ed.2d 47 (2002) (quotation and marks omitted) (emphasis in original). A witness's answers "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over [her] valid claim of privilege." United States v. Vangates, 287 F.3d 1315, 1320 (11th Cir. 2002) (quoting Murphy, 465 U.S. at 427, 104 S.Ct. at 1142). In McKune, the Supreme Court explained:

> The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to

choose . . . [T]he government need not make the exercise of the Fifth Amendment privilege cost free.

Id. at 41, 122 S.Ct. at 2029 (internal quotations and marks omitted).

In Mitchell, the Supreme Court examined an appeal in which the defendant neither put on evidence at sentencing, nor testified on the issue of drug quantity. Mitchell, 526 U.S. at 319, 119 S.Ct. at 1310.  The district court subsequently (1) determined that the defendant had no right to remain silent at sentencing, (2) relied in part on the defendant's decision not to testify in finding that the government's evidence was credible, and (3) stated that it had "held it against" the defendant that she had not testified.  Id. at 319, 119 S.Ct. at 1310-11.  After determining that the Fifth Amendment right against self incrimination extends to sentencing hearings, the Supreme Court concluded that the district court erred in "holding [the defendant's] silence against her in determining the facts of the offense at the sentencing hearing."  Id. at 328-30, 119 S.Ct. at 1315-16.

Similarly, in Rodriguez, we concluded that the district court erred when it considered the defendants' (1) exercise of their Fifth Amendment rights not to testify, and (2) their decisions to appeal,  in denying their requests for adjustments of their base offense levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.  Rodriguez, 959 F.2d at 197-98.  We noted that § 3E1.1 was not facially

unconstitutional under the Fifth Amendment, and that a defendant's failure to do such things as making a statement to police or denying his guilt may justifiably result in the denial of this adjustment. Id. at 197. Nevertheless, we determined that, if a defendant has shown some signs of remorse, but also has exercised his constitutional or statutory rights, a court should not balance the exercise of those rights against the defendant's expression of remorse in determining whether his "acceptance" was adequate. Id. at 197-98.

On the other hand, in United States v. Fleming, 849 F.2d 568, 569-70 (11th Cir. 1988), we determined that the defendant's Fifth Amendment privilege against self-incrimination did not prohibit the court from considering evidence showing that the defendant had been involved in uncharged crimes, even though the defendant declined to present rebuttal evidence because this testimony would have jeopardized his constitutional rights relative to ongoing investigations. Id. at 569-70. We explained that (1) the right to allocute was not constitutional; and (2) no authority supported the defendant's claim that the court either had to refuse to consider evidence of acts for which the defendant had not been charged, or grant him immunity from prosecution for any statements made during allocation. Id. at 569. Important to this analysis, we discussed that we did not have to decide what accommodation the district court might have been required to make to protect the

16

defendant because the defendant made no requests, other than that the court not consider the evidence of prior bad acts.  Id. at 570.

In the instant case, the prosecutor asked Tebrugge during cross-examination at sentencing if she had taken furniture from Neely's home, to which Tebrugge answered affirmatively.  Tebrugge, however, objected to this questioning, arguing that (1) she did not wish to incriminate herself because she had a pending state charge relating to her taking this furniture, and (2) the question was not within the proper scope of cross-examination.  The court overruled this objection, concluding that Tebrugge's knowledge about the stolen furniture was directly relevant to her testimony about her knowledge and involvement with the stolen firearms.

Nevertheless, the court gave Tebrugge the option of either asserting her Fifth Amendment privilege and completely withdrawing her direct examination from the court's consideration, or answering the prosecutor's questions that were within the scope of cross-examination.  The court did not inform Tebrugge that it would "hold it against" her if she chose to withdraw her testimony.  Indeed, after choosing to proceed with her testimony,  Tebrugge responded that she had believed that the parties had agreed that she and her husband would pay for the furniture once her husband had his medical license reinstated.  Thus, unlike the facts in Mitchell and Rodriguez, the record reflects that the court recognized that

17

Tebrugge had a Fifth Amendment right not to testify, and it did not threaten to "hold against her" her decision whether to testify. See Mitchell, 526 U.S. at 319, 119 S.Ct. at 1310-11; see also Rodriguez, 959 F.2d at 197-98. Moreover, similar to the defendant in Fleming, Tebrugge did not request any accommodations, other than that the government not be allowed to question her as to her pending state charges. See Fleming, 849 F.2d at 570.

To the extent that Tebrugge also is arguing that this line of questioning exceeded the scope of cross-examination, she testified on direct examination that, on the day that she had opened the safe containing the firearms, she had not seen her husband remove the firearms. Tebrugge stated she only later had learned that her husband had removed the firearms and had placed them in a storage facility that she previously had rented to store valuables. Tebrugge also testified that, when she and her husband had gone to North Carolina, she had not seen firearms being unloaded and had not had any conversations with Brown.

Moreover, on cross-examination, Tebrugge again stated that, after she had opened the safe with the firearms, she had not known what had happened to the items in the safe, and she only had assumed that they were taking the firearms to North Carolina. Because the furniture at issue on cross-examination was removed from the same residence during the same time period as the guns, Tebrugge's

knowledge about the furniture was "reasonably related" to the extent of her knowledge of, and participation in, the removal of the firearms. See Pilcher, 672 F.2d at 877. The district court, therefore, did not violate Tebrugge's Fifth Amendment rights by giving her the option to either testify at sentencing and subject herself to all proper cross-examination on the pending state theft offense, or to withdraw her testimony.

Tebrugge's final argument is that the district court committed a Blakely/Booker violation when it considered the federal guidelines in determining her sentence. In a brief she prepared prior to the Supreme Court's decision in Booker, she contends that the Supreme Court's holding in Blakely should preclude federal courts from applying the federal guidelines, even in only an advisory manner, because the guidelines are facially unconstitutional and should be rendered void.

Because Tebrugge timely raised a Blakely objection in the district court, we review her Blakely/Booker claim on appeal de novo, but reverse or remand only for harmful error. See United States v. Anderson, 289 F.3d 1321, 1326 (11th Cir. 2002). "[A] constitutional error is harmless if 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" United States v. Nealy, 232 F.3d 825, 829 (11th Cir. 2000).

In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S.Ct. at 2362-63. Prior to Tebrugge's sentencing hearing, the Supreme Court revisited that rule in Blakely, in the context of Washington state's sentencing guideline scheme, and clarified that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . . . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, 542 U.S. at ___, 124 S.Ct.at 2537 (emphasis in original). Applying these principles, the Court held that Blakely's sentence—which was enhanced under the state guidelines based on the sentencing court's additional finding by a preponderance of the evidence that Blakely committed his kidnaping offense with deliberate cruelty—violated the Sixth Amendment. Id. at ___, 124 S.Ct. at 2534-38. In a footnote, however, the Court explicitly remarked that "[t]he Federal Guidelines are not before us, and we express no opinion on them." Id. at ___ n.9, 124 S.Ct. at 2538 n.9.

20

While the instant case was pending on appeal, the Supreme Court issued its decision in Booker, finding "no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue" in Blakely. Booker, 543 U.S. at ___, 125 S.Ct. at 749. Resolving the constitutional question left open in Blakely, the Supreme Court held that the mandatory nature of the federal guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Id. at ___,125 S.Ct. at 749-51. In extending its holding in Blakely to the Guidelines, the Court explicitly reaffirmed its rationale in Apprendi that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at ___, 125 S.Ct. at 756.

In a second and separate majority opinion, the Court in Booker concluded that, to best preserve Congress's intent in enacting the Sentencing Reform Act of 1984, the appropriate remedy was to "excise" two specific sections—18 U.S.C. § 3553(b)(1) (requiring a sentence within the guideline range, absent a departure) and 18 U.S.C. § 3742(e) (establishing standards of review on appeal, including de novo review of departures from the applicable guideline range)—thereby effectively rendering the Sentencing Guidelines advisory only. Id. at ___, 125

21

S.Ct. at 764. Thus, the guidelines range is now advisory; it no longer dictates the

final sentencing result but instead is an important sentencing factor that the

sentencing court is to consider, along with the factors contained in 18 U.S.C.

§ 3553(a).[7] Id. at ___, 125 S.Ct. at 764-65).

In United States v. Shelton, No. 04-12602 (11th Cir. Feb. 25, 2005), we

recently vacated and remanded a defendant's 190-month sentence, based on the

defendant's argument that the district court plainly erred in imposing the sentence

under the federal guidelines, in light of Blakely and Booker. See id., manuscript

op. at 8-17. We determined that no Sixth Amendment violation occurred because

the judicially determined facts on which the court relied in calculating the

defendant's guideline range either were prior convictions that need not be alleged

in the indictment, or were admitted by the defendant during his change-of-plea

colloquy. See id. at 8-10. Nevertheless, we determined that, because the district

---

[7] These other relevant factors in § 3553(a) include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy statement []; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." See 18 U.S.C. § 3553(a)(1)-(7).

court considered and applied the federal guidelines as mandatory, plain error occurred under <u>Booker</u>. See <u>id.</u> at 10-13.[8]

We further held in <u>Shelton</u> that the defendant's substantial rights were affected by this error because (1) the court's comments at sentencing showed that there was a reasonable probability that it would have imposed a lesser sentence in the defendant's case if it had not felt bound by the guidelines, and (2) the defendant had established a reasonable probability that some sentence below the guideline range would have been permissible and reasonable in light of <u>Booker</u> and the § 3553(a) factors. See <u>id.</u> at 13-16. Finally, we concluded, under the fourth prong of plain-error review, that the defendant had shown that the error had affected "the fairness, integrity or public reputation of the judicial proceedings in his particular case." See <u>id.</u> at 16-17.

Here, Tebrugge's PSI recommended a 4-level increase, pursuant to § 2K2.1(b)(1)(B), because her § 922(j) offense involved 22 firearms. See U.S.S.G. § 2K2.1(b)(1)(B) (providing for 4-level increase in offense level if the offense involved 8 to 24 firearms). However, Tebrugge's indictment charged her

---

[8]    During the sentencing hearing in <u>Shelton</u>, the district court (1) expressed several times its view that the sentence required by the guidelines was too severe; (2) noted that the defendant's criminal history category was based on his past charges, instead of on the actual nature of the crimes as reflected in the sentences imposed in those cases; and (3) stated that its sentence at the low end of the defendant's guideline range was "more than appropriate." See <u>Shelton</u>, No. 04-12602, manuscript op. at 6-7.

23

with concealing and possessing these firearms, and, in fact, listed each firearm individually. Moreover, in pleading guilty, Tebrugge conceded that she stole the firearms listed in her indictment. Thus, similar to the facts in Shelton, in calculating Tebrugge's guideline sentence, the court did not rely on facts not admitted by her or charged in her indictment and, thus, did not violate the Sixth Amendment. See Booker, 543 U.S. at ___, 125 S.Ct. at 756; see also Shelton, No. 04-12602, manuscript op. at 8-17.

Unlike the defendant in Shelton, however, Tebrugge failed to show that the court, nevertheless, committed a Booker violation by treating the federal guidelines as mandatory. Indeed, although the court conducted Tebrugge's sentencing hearing before the Supreme Court issued its decision in Booker, the court stated that it had concluded that Blakely was applicable to the federal guidelines, such that it could consider them, but that they were merely advisory.

Moreover, to the extent that Tebrugge did not abandon by failing to argue in her initial brief that the court failed to consider the factors listed in § 3553(a), see Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (issues not argued in initial brief generally are deemed abandoned), the court heard extensive testimony at sentencing on the nature of the offense and on Tebrugge's role in the offense. The court, at least implicitly, adopted the PSI's description of

the offense and its findings on Tebrugge's history and characteristics. In imposing a sentence of 12 months' and 1 day' imprisonment—a sentence at the low end of Tebrugge's guideline range—the court explained that (1) Tebrugge had played a lesser role than her husband in the offense; (2) her criminal history was minimal; and (3) her intent in possessing the firearms had been retaliatory, instead of to profit from their sales. The court also explained that, although it had considered the motion for a downward departure, it had decided that a departure was not warranted. Thus, the court considered the nature and circumstances of the offense, Tebrugge's character, and the need to avoid unwarranted sentencing disparities between the codefendants. See 18 U.S.C. § 3553(a)(1)-(3), (6).

The court also considered the need to provide restitution in ordering Tebrugge to pay restitution in the amount of $7,000. See 18 U.S.C. § 3553(a)(7). In ordering that the Tebrugges' terms of imprisonment run consecutively—to allow them to continue caring for their minor children—the court demonstrated that it considered the kinds of sentences available. See 18 U.S.C. § 3553(a)(4). In addition, when the court inquired whether Tebrugge required further explanation as to her sentence, Tebrugge responded negatively. Because the district court did not treat the federal guidelines as mandatory in sentencing

Tebrugge, and because it considered the factors listed in § 3553(a), no <u>Booker</u> violation occurred.

Accordingly, we conclude that the district court did not (1) clearly err in not adjusting Tebrugge's guideline level based on minor role; (2) violate her Fifth Amendment right not to incriminate herself at sentencing; or (3) violate her Sixth Amendment right to a jury trial in considering the federal guidelines in sentencing her. We, therefore, affirm Tebrugge's sentence.

**AFFIRMED.**

BARKETT, Circuit Judge, concurring:

I concur in the result.